UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHRISTIAN JOHNSON                          CIVIL ACTION

V.                                         NO. 18-5919

ASSOCIATED WHOLESALE
GROCERS, INC.                              SECTION "F"

ORDER AND REASONS

Before the Court is the defendant's motion for summary judgment. For the reasons that follow, the motion is GRANTED, in part, and DENIED, in part.

**Background**

This employment discrimination lawsuit arises out of a warehouse worker's charge that he was required to work demanding hours in undesirable conditions because of his race and then fired in retaliation for voicing his concerns.

Associated Wholesale Grocers, Inc. is a private, cooperative, grocery wholesaler that services independently owned supermarkets throughout the United States. AWG's warehouse located in Pearl River, Louisiana has various departments and positions related to its business of receiving and supplying a full range of goods to its member stores. The warehouse offers two daily shifts – the inbound/day shift and the outbound/night shift. Within those shifts, employees work in different departments, such as dry goods,

grocery items, fresh meat, frozen goods, and perishables. Each day during the inbound shift, which occurs between approximately 3:00 a.m. and 11:00 a.m., the Pearl River facility receives products from vendors, and AWG employees store those products in the appropriate departments within the warehouse. During the outbound shift, which occurs between the hours of 2:30 p.m. and 10:30 p.m., AWG employees fill member orders by operating pallet jacks throughout the warehouse aisles to locate, select, and stack ordered items onto pallets.[1]

To ensure that all customer orders are filled during each outbound shift, AWG calculates a "fair share" amount for the day, which represents the number of cases that each order selector must pull in order for AWG to reach its total production quota.[2] Pursuant to this system, it is critical for order selectors to

---

[1] While filling orders, the selectors wear headsets, which provide them with computer-generated directions to the location of each case that they are required to "pull." Upon completing a customer order, a selector transports his or her full pallet to the loading dock area and then proceeds to fill another order.

Generally, selectors are assigned orders through an automated system; however, under some circumstances, managers assign orders to specific selectors.

[2] For example, if the total production quota is 10,000 cases, and five order selectors are working, the fair share amount would be approximately 2,000 cases for each selector. According to this system, an order selector who completes his or her fair share early and is in good standing may clock out for the day yet still be compensated for a full 40 hours of work. Moreover, if a selector who is close to reaching his or her fair share for the day receives a large order that would place the selector above his or her fair share amount, the selector may request to be reassigned a smaller order.

pull and stack their cases so that orders can be loaded onto delivery trucks for timely departure. Therefore, during any given week, AWG expects each order selector to achieve a 225-case-per-hour level of productivity. Newly hired selectors, however, have a lower production expectation until they become more experienced.

The inbound shift differs from the outbound shift in that members of the inbound shift do not fill customer orders. Accordingly, while the volume of work for the outbound shift varies each day, the timeline of the work during the inbound shift is more predictable and often requires less overtime. Typically, employees are hired into the outbound shift and then may transfer to the inbound shift through a shift-bidding process that is based upon seniority and disciplinary record.

Christian Johnson is a 25-year-old African-American male who was employed by AWG on four separate occasions as an order selector in the grocery, or "dry," department of the Pearl River warehouse. Johnson first began working for AWG in March of 2014 until he resigned in June of 2015 for another job opportunity. He was then rehired in July of 2015 and February of 2016 before resigning in October of 2015 and April of 2016, respectively. Johnson was rehired for the final time in July of 2016 until his employment was terminated in February or March of 2017.[3]

---

[3] Floyd Baker, AWG's Senior Manager of Human Resources, hired Johnson each time he was employed with AWG.

Throughout Johnson's employment with AWG, he believed that management treated white employees more favorably than black employees. For example, in July of 2016, Johnson asked Lloyd Faircloth, the warehouse manager, to assign him to the day shift, which featured better working conditions and more reasonable hours, but Faircloth refused. Because Johnson had observed that the day shift was populated by a larger percentage of white employees, he believed he was denied the position because of his race. Johnson also noticed that many injured white employees were offered light-duty positions, while he was refused light-duty work after sustaining an on-the-job groin injury in December of 2016.

Johnson also believed that the departments in which order selectors were assigned to work depended on race. For example, he observed that whites heavily overrepresented the "cold side" of the warehouse in the dairy department, where it was easy to fill orders quickly because like items were stored closely together. Johnson frequently complained to his supervisors about this racial disparity; he explained that the "top ten" selectors on the cold side (who were predominantly white) could make their fair share more easily and leave earlier with a full day's pay than experienced selectors on the dry side (who were predominantly African American). In addition to job assignments, Johnson believed that the manner in which employees were disciplined depended on race.

On February 20, 2017, Johnson was written up for failing to meet his production quota.[4] Frustrated by the way he had been treated, Johnson sent a letter to Floyd Baker, AWG's Senior Manager of Human Resources, voicing his concerns. Johnson emailed the letter to Baker on February 21, 2017 at 11:59 a.m.; he complained as follows:

My name is Christian Johnson. I am formally known within AWG as badge number 66214. I have been under employment by this company for the vast majority of the last three years. During the stated time-frame I have endured a lot of trials and turmoil. In the following article I will explicate grievances as I paint an overall perspective of the warehouse.

At AWG, as a selector, loader, or forklift operator we all work under a Willie Lynch type style of management and control. Lloyd Faircloth is the man in the big house and his supervising staff is the SS. We all slave in the warehouse from start to finish and do not deserve to be barked at and threatened as we try to work. In essence the warehouse is the ghettos and we

---

[4] According to AWG's employment records, Johnson received a final written warning for "missed production 178 cph" on February 19, 2017 that was ostensibly signed by Christian Johnson and De'on Moody on February 20, 2017 and by Lloyd Faircloth on February 21, 2017. When questioned about this disciplinary notice during his deposition on February 27, 2019, Johnson testified as follows:

**A.** That doesn't specifically look like my signature. It appears to be my name, but I remember having a conversation with the supervisors around this time regarding the missed production. My production rate was 224 for the week instead of a 225. They were attempting to write me up for missing one case in production.
**Q:** Who wrote you up, if you can recall?

**A:** I think it was Justin Boyet at that time that was attempting to write me up.

**Q:** It was a different write-up from this?

**A:** Yes. It does not look like this one at all.

5

are the faces who are stripped of name and identified by barcode and badge number.

Last night I, as well as more than half of the dry side selectors, received a write up for missing production for previous week. I came to the office trying to ask questions and have a consultation as to why I was just getting off of final written just to be placed back on it and have my job threatened again. I approached Deon Moody and he ran into the comfort of the office just to evade my questions. I refused the write up and asked for an explanation but my request wasn't granted. I questioned Justin Boyet and was ignored and pushed aside.

The analytics, of the production based system, in which the company is ran is flawed. It is my understanding that it is a overall company policy not to tamper with the flow of the queued work. It is also in my understanding that new selectors receive quantity orders with lower goal times in order to pick up production, selectors are assigned special orders, multiple fairshares, and perishable has a top 10 in which these selectors pull exclusively meat and dairy trips.

Yesterday I received a write up for missing production placing me on a final written and I have been continously [sic] harassed by management as a scare tactic. The selectors, including myself, have been disregarded as human beings and are being controlled as chattle [sic]. The top[p]ed out selectors with years of experience are symbolically getting our foot chopped off and forced to run. Welcome to the planation called AWG.

Production can no longer be the basis in which we as selectors are valued. The playing field became uneven as soon as those orders became tampered with. This is common knowledge within the warehouse. I worked a Saturday shift where i ran a 390 with nothing but drink trips and pulled over 400 cases over "fairshare" because management knowingly assigned me orders.

I feel uncomfortably targeted in my own workplace and that makes me uncomfortable amongst my peers. I work everyday from start to finish, yesterday was the last straw. I have been unfairly singled out ever since I was forced to take 2 weeks off of work with no pay because i wasnt granted light duty per my doctor's request. I was instead laughed at, in my face, in the office because of my injuries, and left without a paycheck for 2 weeks.

I have witnessed how much the management staff disregards the employees first hand. The conditions are continuously getting worse and worse. I've had recent nights where i spent 2 hours after my job duties were done performing janitorial duties because the janitor hasn't been replaced after over a month. I watch in amazement as my supervisors create an unjustifiable paper trail to try to usher topped out selectors out of the door. I understand that 2 selectors can do my same job for less money regardless of experience. I understand that the fiscal quarter is coming to a close and management wants to secure bonuses by regularing [sic] payroll and various other areas.

I did not seek employment with this company to meet figures and quotas. I came to provide for and support my children and family. This motivation and stated goal seems impossible to me now as management continues to make conditions unbearable for the selectors. The company came from providing the laborers with free water, to charging a quarter, to charging 50 cents. Selectors are no longer given gloves because it was said it is not company protocol to do so.

I work from dry to cold several times a week and periodically during the same shift. I am provided with no gloves to protect myself or adequate clothing to stay warm and under good health. We become sick because of the environment that we are forced to be subjected to. Aisles outstretched longer with add ons and new additions, making it harder on selectors. Yet the production requirements stayed the same. Working under this company I feel as if I am being set up for failure and that stated failure is inevitable.

Ive seen peers disrespected and cursed in front of the entire crew by Lloyd Faircloth. We are shaken into submission by this companies [sic] representatives. Numbers are the only focus as working conditions continue to worsen. Grown men have been degraded and referred to as thieves stealing company time while being treated as slaves picking cases instead of cotton. I have never spent one night in jail but i feel institutionalized within the confinements of AWG.

We are in a period of time where bottles of human urine are being uncovered in aisles. Human feces is being found between slots. Selectors are thrown back and forth between hot and cold weakening our endurance and immune systems and expected to perform the same. Rodents are being seen leaving trails [o]f crumbs and wastes. Cats are being seen in aisles feasting on

wastes.  Trash is being stored on alpha 98 and the back of the warehouse for days on end left to stagnate.  Equipment is literally catching on fire while in use jeopardizing lives and nothing is being done.  All issue[s] are being ignored and selectors are taking brutal abuse and the bulk of the blame.

How can I meet these requirements when all selectors arent subjected to the same standards.

Top 10 on the cold side averages out to a total of over 30 dollars an hour[] in guaranteed money and are given better conditions in the warehouse.  The playing field is uneven, and I speak for all of my peers to address the problems and subject them to change.  AWG and its management has extended knowledge of all of these standards and conditions and have blatantly refused to address the issues.  The harassment endured overtime in addition to the favoritism, d[i]scrimination and disrespect has made it virtually impossible for me to feel comforted in my workplace.  I am at my wit's end.  I am drained physically, mentally, and emotionally by the structure of this company and i feel targeted when all i try to do is show up and perform to the best of my ability everyday at work.  Respect is deserved and demanded.  I will thank you for your time once the stated complications have been addressed.

Christian Johnson

Floyd Baker responded to Johnson's email within fifteen minutes; he requested a phone number at which he could reach Johnson and explained that he was in a class but would call as soon as he could.  Baker also forwarded Johnson's email to Bo Stuart, AWG's Director of Operations; he instructed Stuart to call him and not to share the email with anyone at that time. Nonetheless, when Johnson arrived for his shift that afternoon, he noticed that Lloyd Faircloth, Justin Boyet, Shadi Krishan, and Bo Stuart each had a copy of the letter in their hands and were looking at him in a strange way.  Faircloth then escorted Johnson to Bo Stuart's office, where Johnson was seated across from Stuart

while five managers stood around him.[5]  Clenching his fists and avoiding eye contact, Bo Stuart questioned Johnson about the contents of the letter.  Stuart appeared most troubled by the allegations concerning differential treatment based on race and specifically challenged Johnson's description of the warehouse as a "plantation."  Although Johnson felt cornered and increasingly threatened as the meeting progressed, he attempted to explain that opportunities in the areas of work production, discipline, and availability of light duty were dependent upon race.  After thirty minutes of questioning, Johnson was told to return to work and not to speak to anyone.

Later that afternoon, Johnson was approached by Floyd Baker, Bo Stuart, and Lloyd Faircloth for a second meeting.  This trio also challenged Johnson's allegations about the race dependent way in which work assignments were distributed.  Johnson explained that he was feeling threatened, and he asked to be excused.  On Johnson's way out, Baker asked if he was interested in meeting individually to discuss the email, and the pair agreed to meet in Baker's office the next day at 10:30 a.m.

When Johnson arrived at Baker's office the following morning at 10:40 a.m., Baker was not there.  After waiting for twenty

---

[5] All of these individuals were Caucasian, except for Shadi Krishan, who is Middle Eastern.  Floyd Baker did not attend this meeting.

minutes, Johnson went home to change clothes in preparation for his 2:00 p.m. shift. At 11:42 a.m., Baker emailed Johnson to apologize that they had missed each other; he also said that he was about to leave the country for a vacation and asked whether Johnson was available to meet when he returned on Tuesday, February 28.[6] After not receiving a response from Johnson by the next afternoon, Thursday, February 23, Baker sent another email to remind Johnson that he would be on vacation until Tuesday, February 28. Baker also told Johnson to take off of work until he returned when they would have a chance to speak in person. He asked Johnson to stop by his office on February 28 at 2:00 p.m. and advised that that he would let the warehouse know that Johnson would be off until his return.

Meanwhile, on the morning of Wednesday, February 22 or Thursday, February 23, Johnson's badge was deactivated, which precluded him from entering the warehouse.[7] Each day thereafter, he reported to the AWG gate in an attempt to resume working, despite consistently being denied entry. Although it is undisputed that Johnson and Baker met on the afternoon of February 28, 2017,

---

[6] Johnson did not respond to Baker's email; instead, he forwarded his February 21 grievance to "HR.CORP@awginc." Because that is not a valid email address, no one in the HR department at AWG received it.

[7] It is unclear from the record exactly when Johnson's badge was deactivated but appears that he was denied entrance no later than Thursday, February 23, 2017.

AWG and Johnson present different accounts of what transpired during and after that meeting.

According to AWG's account, which is presented in the form of Floyd Baker's sworn declarations,[8] Baker and Johnson discussed each complaint contained in Johnson's email. Baker explained that Johnson's position was still available if he wished to return but that AWG expected him to maintain good attendance and meet his production requirements. Because Johnson did not provide a clear answer as to whether he wanted to continue his employment, Baker gave Johnson his cell phone number, and they agreed that Johnson would go home and contemplate his future with AWG. About an hour after the meeting, Johnson emailed Baker to inquire about the status of his job.[9] Baker responded that evening, explaining that

_____

[8] AWG submits two declarations of Floyd Baker – one dated March 12, 2019 and another dated April 9, 2019.

[9] Specifically, Johnson stated in his email dated February 28, 2017 at 4:28 p.m.:

> Nothing was established during the meeting that we had today. I came in with hope of being granted an explanation of the current status of my job. I have been reporting to work everyday at my scheduled start time and have been denied access into the warehouse. This is the forth [sic] day that i will miss and tomorrow will make the 5th. . Thursday and Friday will complete the week that I have not been granted access into the warehouse and denied an active wage. I need a copy of my separation notice as no protocol was followed in the handling of my employment or grievances. I request a copy of my file to article [sic] my offenses. I need a letter with an explanation given as to why my badge was deactivated early Thursday morning by Ross under the direct direction of Bo Stuart. There is no reason that I was confronted less than two hours after contacting

11

Johnson had not been terminated but also had not yet directly answered whether he wanted to continue to work at AWG.[10]

Baker also declares, under penalty of perjury, that after not receiving any response from Johnson on March 1, 2017, or any day thereafter, about whether or not Johnson wanted to return to work, he decided to terminate Johnson with an effective date of March 2, 2017 because AWG typically terminated employees after not hearing from them within 48 hours. Baker further states that, as noted in Johnson's termination slip, attendance and productivity were also

---

you via email on Tuesday by every supervisor in the warehouse b[e]aring a copy of the letter that i sent to you in confidence. Open door policy? Lastly, I need a scheduled time in which I can receive the according documentation.

If these needs cannot be met, I will need the time that I can return to my duties. I will need proper compensation for the time that i was forced to miss work, as a result of the actions by the associates in which you represent. In addition to this, I will need the latter documentation which is stated above.

[10] On February 28, 2017 at 5:36 p.m., Baker wrote:
Christian,

I am working on the things you and I talked about today. As for you working, you have not been terminated but I did ask you today if you wanted to work here, to which you did not answer me directly. When you left my office today you had my cell phone number and we agreed we would talk tomorrow and you would let me know if you wanted to work here. I also told you we wanted you to work here, have good attendance and be productive as you have demonstrated you can do. I will continue to work on what I said and look forward to talking with you tomorrow.

Floyd

factors in the termination decision. According to AWG's employment records, Johnson was disciplined on various occasions in 2016 and 2017 for his failure to follow AWG's attendance policies, and he received a final written warning on February 20, 2017 for failing to meet the production expectation of 225 cases per hour by only pulling 178 cases per hour.[11]

Mr. Johnson presents his account of the February 28, 2017 meeting and its aftermath in his own sworn declaration. Johnson declares that he unmistakably indicated during the meeting that he wanted and needed his job back. He further declares, under penalty of perjury, that he sent two emails to Mr. Baker on the afternoon of March 1. At 4:43 p.m., Johnson wrote: "I wouldnt report to you for a meeting that lasted for an hour and 20 minutes without intentions of returning to work (Common Sense plays a factor here)." And at 4:46 p.m., Johnson added: "Nothing was established during the meeting that we had yesterday. I came in with hope of being granted an explanation of the current status of my job . .

---

[11] Specifically, these employment documents indicate that Johnson received six disciplinary notices between October of 2016 and February of 2017: (1) he was interviewed on "10/11/18" for calling out on "10/8/16;" (2) he received a written warning on 11/6/16 for calling out 11/2/16; (3) he was placed on disciplinary probation for the period of "12/4/16 through 6/4/16" because of "attendance;" (4) he was also placed on disciplinary probation for the period of 12/19/16 through 6/16/17 because he left early on 12/19/16; (5) he received a final written warning on 1/23/17 because he left early on 1/22/17 and only worked 3 hours and 12 minutes that day; and (6) he received another final written warning on 2/19/17 because he had "missed production 178 cph."

. ." Johnson also states in his sworn declaration that his absences were medically excused and that he had only been disciplined *once* for missing his production quota. Relatedly, Johnson declares that, prior to complaining to HR, he had received several raises and was often commended by his supervisors for the speed and skill with which he worked.

Following the submission of Johnson's sworn declaration, which references a March 1, 2017 email, AWG submitted a second declaration of Floyd Baker, dated April 9, 2019. In his second sworn statement, Baker declares that he "inadvertently failed to produce all [of his] emails relating to Mr. Johnson and apologize[s] for failing to do so." He further declares that he "now recall[s] that he received emails from Mr. Johnson after February 28, 2017" and "need[s] to clarify that, after February 28, 2017, Mr. Johnson did not contact [him] by phone as he was instructed to do so." Finally, Baker declares that he terminated Mr. Johnson after Johnson did not return his phone calls because he "did not consider [Johnson's] emails as an appropriate response in light of [the] repeated instructions that [Baker] wanted to speak with him about his commitment to work at AWG."

Throughout the spring and summer of 2017, Johnson continued to email Baker, inquiring as to his employment status and asking to return to work. It is undisputed that Baker declined to respond to these emails, at the direction of Pat Reeves, AWG's Senior Vice

President and Chief Human Resources Officer. On December 12, 2017, more than nine months after he was locked out of the AWG facility, Johnson filed a charge of race discrimination and retaliation with the EEOC. He alleged that he was threatened to be written up on February 20, 2017 due to inadequate production (although the work was unfairly distributed), confronted by management after sending a confidential grievance letter to Human Resources, and then discharged a day later without reason. The EEOC issued a right to sue letter on May 2, 2018.

On June 14, 2018, Johnson sued Associated Wholesale Grocers, Inc., asserting claims under Title VII, Louisiana state law, and 42 U.S.C. § 1983. Seeking declaratory, injunctive, and monetary relief, Johnson alleges that he was treated differently on account of his race and then fired in retaliation for protesting race discrimination in the workplace. AWG now moves for summary judgment, contending that no genuine issue of material fact exists concerning the failure of Johnson's hostile work environment, disparate treatment, and retaliation claims under Title VII and that the plaintiff's § 1983 claim also fails as a matter of law.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Anderson, 477 U.S. at 249 (citations omitted); King v. Dogan, 31

F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

## II.

### A.

As a threshold matter, the Court notes that the plaintiff only opposes the defendant's motion for summary judgment insofar as it seeks dismissal of his retaliation claims. Although Johnson's complaint appears to allege claims of race discrimination and retaliation in violation of Title VII and Louisiana's employment discrimination law, Johnson asserts in his opposition papers that "[t]his is a Title VII retaliation case." He further submits that, if AWG "has construed Plaintiff's

complaint to state a cause of action in race discrimination, Plaintiff hereby abandons such claims." Because the plaintiff has abandoned his race discrimination claims, summary dismissal of these claims is appropriate.

*B.*

Insofar as Johnson's complaint asserts any claim under 42 U.S.C. § 1983, AWG is likewise entitled to summary judgment. To establish § 1983 liability, the plaintiff must satisfy three elements: (1) deprivation of a right secured by the U.S. Constitution or federal law; (2) that occurred under color of state law; and (3) was caused by a state actor. <u>Victoria W. v. Larpenter</u>, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted). Because AWG is a private corporation and there is no record evidence that AWG conspired with or acted in concert with any state actor, summary judgment dismissing the plaintiff's § 1983 claim is warranted.

II.

The Court next considers AWG's challenge to Johnson's Title VII and Louisiana state law retaliation claims.[12]

---

[12] Because "Louisiana courts and federal courts applying Louisiana law have routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statues," <u>Smith v. Amedisys Inc.</u>, 298 F.3d 434, 448 (5th Cir. 2002), this Court considers the plaintiff's federal and state law retaliation claims together.

Moreover, the Court disagrees with AWG's contention that Johnson's retaliation claim is governed by Louisiana's Whistleblower Statute, La. R.S. § 23:967, and therefore is time-barred. Notably, other courts in this Circuit have held that "La. R.S. 51:2256 creates a cause of action for retaliation in the case

Johnson charges that AWG unlawfully retaliated against him based upon his complaints of race discrimination in the workplace. AWG moves for summary judgment, contending that the plaintiff can neither prove that he engaged in protected activity, nor rebut AWG's legitimate, non-retaliatory reasons for terminating him.

*A.*

Like employment discrimination claims, retaliation claims under Title VII are governed by the McDonnell Douglas burden-shifting framework. See LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 388 (5th Cir. 2007) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Under that framework, an employee must first establish a prima facie case of retaliation by showing that: (1) he engaged in a protected activity; (2) his employer took an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. McCoy v. City of Shreveport, 492 F.3d 551, 556-57 (5th Cir. 2007). If the employee makes such a showing, the familiar burden-shifting framework identified above applies: the employer must articulate

---

of employees alleging discrimination based on a disability, race, color, religion, sex, national origin, or pregnancy, childbirth and related medical conditions." Martin v. Winn-Dixie La., Inc., No. 3:13-CV-00682-JWD-SCR, 2015 U.S. Dist. LEXIS 34921, at *18 (M.D. La. Mar. 20, 2015) ("As a complaint of retaliation was included in Plaintiff's original EEOC Charge, Plaintiff, under this new law, would have a valid and viable claim under the LEDL for retaliation."); see also Liles v. Burkes Outlet Stores, LLC, No. 2:14-CV-03161, 2015 U.S. Dist. LEXIS, at *9-11 (W.D. La. May 1, 2015).

legitimate, non-discriminatory reasons for its employment action and then, if articulated, the burden shifts back to the employee to show that the employer's proffered reasons are a pretext for its actual retaliatory purpose.  See id.

*B.*

AWG urges that summary judgment is appropriate because Johnson cannot demonstrate that he engaged in protected activity. Under Title VII, "[a]n employee has engaged in protected activity when []he has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing' under Title VII." Douglas v. DynMcDermott Petroleum Operations Co., 144 F.3d 364, 372-73 (5th Cir. 1998) (quoting 42 U.S.C. § 2000e-3(a)).  To satisfy the opposition requirement,[13] the plaintiff "need not prove that the conduct []he opposed rose to the level of a Title VII violation, but []he must at least show a reasonable belief that it did." Taliaferro v. Lone Star Implementation & Electric Corp., 693 F. App'x 307, 310 (5th Cir. 2017) (per curiam) (quoting E.E.O.C. v. Rite Way Serv., Inc., 819 F.3d 235, 237 (5th Cir. 2016)).  Relatedly, "[a] vague complaint

---

[13] Because Johnson did not file his EEOC charge or otherwise participate in any proceeding under Title VII until after the alleged retaliatory employment action occurred, the participation clause cannot form the basis of his retaliation claim.  See 42 U.S.C. § 2000e-3(a).

that does not reference a discriminatory employment practice does not constitute a protected activity." Carter v. Target Corp., 541 F. App'x 413, 418 (5th Cir. 2013) (per curiam).  In other words, "[f]or an internal complaint made to a company to be a protected activity, it must clearly oppose an unlawful Title VII practice." See Reed v. Brady Trucking, Inc., No. H-18-4437, 2019 U.S. Dist. LEXIS 44041, at *18 (S.D. Tex. Mar. 18, 2019).

Johnson contends that his employment was terminated in retaliation for (i) sending an email to Human Resources on the morning of February 21, 2017, and (ii) continuing to protest AWG's racially discriminatory employment practices during two meetings with management that afternoon.  AWG submits that Johnson did not engage in protected activity because his February 21 email challenges general workplace conditions that affected all order selectors, regardless of race.  According to AWG, although the email includes the words "harassment" and "discrimination" and uses coded language, it nevertheless makes no reference to any racially discriminatory practice.  AWG further contends that Johnson's "new allegations" of additional protected activity during his meetings with management do not save his retaliation claim because they are presented in the form of a self-serving declaration that contradicts his prior sworn deposition testimony. The Court disagrees with AWG in both respects.

First, Johnson's February 21 email specifically references differential treatment of dry-side and cold-side order selectors by stating that selectors are not subjected to the same standards:

> [P]erishable has a top 10 in which these selectors pull exclusively meat and dairy trips.
>
> . . .
>
> How can I meet these requirements when all selectors arent subjected to the same standards.
>
> Top 10 on the cold side averages out to a total of over 30 dollars an hours [sic] in guaranteed money and are given better conditions in the warehouse. The playing field is uneven, and i speak for all of my peers to address the problems and subject them to change.

Notably, the record reflects that the dry side was more heavily represented by African-American employees, while the cold side contained a larger percentage of Caucasians.[14]  In addition, Johnson's email employs imagery of slavery; it characterizes Lloyd Faircloth as "the man in the big house and his supervising staff

---

[14] During his deposition on February 27, 2019, Johnson testified as follows concerning the racial composition of AWG's order selectors:

> **Q.**  So the top ten that you talked about that got the better conditions, do you know whether those individuals included whites and blacks?
>
> **A.**  I think the majority of the people were white.
>
> . . .
>
> **A.**  Top selectors for dry was typically where we had most of the black people, on the dry side.

Similarly, in his sworn declaration dated April 2, 2019, Johnson stated that "Caucasians in the 'top ten' cold side . . . heavily over-represented."

[a]s the SS," the AWG warehouse as a "plantation," and the selectors as "slaves picking cases instead of cotton."

Moreover, even if the February 21 email itself did not explicitly reference any racially discriminatory employment practice, the record reflects that Johnson engaged in protected activity during his meetings with management that afternoon. Johnson has declared, under penalty of perjury, that Bo Stuart specifically challenged his description of the warehouse as a "plantation," after which he attempted to explain that "opportunities in the areas of work production, discipline and availability of light duty were dependent on race." He further declares that, later that same day, Floyd Baker, Bo Stuart, and Lloyd Faircloth challenged him over "assertions [he] had made about the race dependent way that work production, discipline, work assignment and availability of light duty was managed at AWG."

Pursuant to the "sham affidavit rule, an affidavit or declaration that contradicts prior deposition testimony may not be used to manufacture a dispute of fact to defeat a summary judgment motion." Reed v. United States, No. 17-1491, 2019 WL 1317563, at *2 (S.D. Tex. Mar. 22, 2019) (citing Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 386 (5th Cir. 2000)); see also Hacienda Records, L.P. v. Ramos, 718 F. App'x 223, 235 (5th Cir. 2018) (per curiam) ("It is well settled that [the Fifth Circuit] does not allow a party to defeat a motion for summary judgment

using an affidavit that impeaches, without explanation, sworn testimony."). AWG urges the Court to strike Johnson's declaration from the record, contending that Johnson's efforts to insert race-based comments into his conversations with management directly contradict Johnson's prior sworn deposition testimony that they did not "go over" anything other than what was discussed in the letter. Johnson testified as follows concerning his first meeting with management on the afternoon of February 21, 2017:

> **Q.** So walk me through what happened at this meeting.
>
> **A:** I sat down at the meeting, and this was two hours after I sent the letter, perhaps. And that's where Bo comes up to me and said, "I received this letter that you wrote to HR. It says a lot of hurtful things in it," and I was like, "What do you mean?" He was like, "It says a lot of hurtful things, you know, and if you were to have a problem with the way that it was ran or management, I would want to know those problems so we can get into it."
>
> So at that point, he was kind of dissecting my letter and kind of asked me, "Well, what did you mean by this, when you said this? What did you mean by that?" And I have to reiterate the points. I meant specifically what I wrote at this time.
>
> . . .
>
> **Q.** Other than what is in the letter, and we'll get to that, did you add anything to --
>
> **A.** As a grievance or anything?
>
> **Q.** Anything other than what is in the letter that we will go over.
>
> **A.** No. We were going over everything specifically that pertained.

AWG contends that, because Johnson has failed to provide an explanation for why his prior sworn deposition testimony was false,

his contradictory declaration testimony should not be considered for purposes of summary judgment. But, the Court disagrees that the allegations contained in Johnson's sworn declaration contradict his prior deposition testimony. Notably, Johnson was not squarely asked during his deposition whether race-based questions or comments were made during either meeting. Accordingly, this is not a situation where a plaintiff's declaration and deposition testimony cannot be reconciled. Cf. Porto v. Chevron NA Expl. & Prod. Co., No. 17-1419, 2018 WL 3559103, at *11 (S.D. Tex. July 24, 2018) ("Because Porto's declaration testimony that Green and Beaugh harassed and discriminated against her on the basis of disability contradict without explanation Porto's deposition testimony, the court will . . . strike ¶¶ 7-9 of Porto's Declaration and not consider them.").

Viewing the facts, on this record, in the light most favorable to the non-moving party, the Court finds that: (1) a reasonable factfinder could conclude that, through his email and subsequent meetings with management, Johnson complained about AWG's custom of treating white employees more favorably than black employees in terms of job assignments, work production, and discipline; and (2) Johnson could have reasonably believed that the conduct about which he complained violated Title VII. Thus, it cannot be said, as a matter of law, that Johnson did not engage in protected

activity.  Cf. Davis v. Dallas Indep. Sch. Dist., 448 F. App'x. 485, 493 (5th Cir. 2011) (unpublished) (per curiam) (finding that an isolated statement complaining of a "hostile work environment" did not constitute "protected activity" under Title VII because it "lacked a racial or gender basis"); Tratree v. BP N. Am. Pipelines, Inc., 277 F. App'x. 390, 395 (5th Cir. 2008) (unpublished) (per curiam) ("Complaining about unfair treatment without specifying why the treatment is unfair . . . is not a protected activity."); Jones v. CVS Pharmacy, Inc., No. 07-1383, 2009 U.S. Dist. LEXIS 56222, at *12 (N.D. Tex. July 2, 2009) ("Although these complaints use the words 'retaliation,' and 'harassment,' there is no reference to any unlawful employment practice under Title VII.").

There are also genuine issues of material fact concerning the second and third elements of Johnson's prima facie retaliation claim.  As for the second element – whether Johnson suffered an adverse employment action – the summary judgment record reveals that Johnson's employment was terminated with an effective date of March 2, 2017.  And, as for the third element – whether a causal link exists between the protected activity and adverse action – the record shows that Johnson was terminated only nine days after he lodged his February 21 complaints with his employer.  The close proximity in time between Johnson's protected activity and termination is sufficient to support Johnson's prima facie case of unlawful retaliation.  See Stephens v. Bd. of Supervisors, No. 16-

6885, U.S. Dist. LEXIS 211800, at *13 (E.D. La. Dec. 27, 2017) ("In cases with '[c]lose timing between an employee's protected activity and an adverse action against [her],' a plaintiff may satisfy the causation requirement of her *prima facie* case through the evidence of proximity alone.") (citations omitted).

Finally, genuine factual disputes exist concerning whether AWG's proffered reasons for terminating Johnson's employment – his subpar employment record and failure to call Baker - are pretext for retaliation. "An employee establishes pretext by showing that the adverse action would not have occurred but for the employer's retaliatory reason for the action." <u>Rodriguez v. Brownsville Indep. Sch. Dist.</u>, 739 F. App'x 227, 231 (5th Cir. 2018) (per curiam) (unpublished) (citing <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 360 (2013)). Thus, to survive summary judgment, "the plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the action but for the protected activity." <u>Id.</u> (quotations omitted).

AWG first submits that, after not hearing from Johnson for over 48 hours, Baker decided to terminate Johnson's employment with an effective date of March 2, 2017.[15] In response, Johnson

---

[15] Pointing to Baker's sworn declaration for support, AWG submits that Baker explained to Johnson on February 28, 2017 that his position was still available if he wished to return but that AWG expected him to maintain good attendance and meet his production

presents evidence to rebut AWG's position that he was terminated for abandoning his job. Pointing to his own deposition testimony and sworn declaration for support, Johnson submits that within one or two days after lodging an internal grievance, he was unable to enter the warehouse because his badge had been deactivated and that he continuously attempted to return to work thereafter. The record also reflects that Johnson emailed Baker twice on the evening of March 1, 2017 concerning the status of his job; specifically, Johnson wrote at 4:43 p.m.: "I wouldnt report to you for a meeting that lasted for an hour and 20 minutes without intentions of returning to work (Common Sense plays a factor here)."

On the eve of the submission date on its summary judgment motion, AWG filed a reply brief, coupled with a new declaration of Floyd Baker, dated April 9, 2019. In his second sworn statement, Baker declares that he "inadvertently failed to produce all [of his] emails relating to Mr. Johnson and apologize[s] for failing to do so." Baker further declares that he "now recall[s] that he received emails from Mr. Johnson after February 28, 2017" and "need[s] to clarify that, after February 28, 2017, Mr. Johnson did

_____

requirements. Baker further declares, under penalty of perjury, that after not receiving any response from Johnson on March 1, 2017, or any day thereafter, about whether or not Johnson wanted to return to work, he decided to terminate Johnson with an effective date of March 2, 2017 because AWG typically terminated employees after not hearing from them within 48 hours.

not contact [him] **by phone** as he was instructed to do so."
(emphasis added). Therefore, Baker now declares that he terminated
Mr. Johnson after Johnson did not return his phone calls because
he "did not consider [Johnson's] emails as an appropriate response
in light of [the] repeated instructions that [Baker] wanted to
speak with him about his commitment to work at AWG."[16]

---

[16] Baker also attaches to his declaration an email chain between himself and Jack Reeves, AWG's Senior Vice President and Chief Human Resources Officer, to corroborate that Johnson continually refused to return his calls and that he did not want to engage in an email "battle" with Johnson.

Baker informed Pat Reeves via email dated March 2, 2017 at 11:46 a.m.: "Left a message on the number I have for Christian. Waiting on his return call. I will try again this afternoon."

Baker added on March 3, 2017 at 7:23 a.m.: "I called Christian twice yesterday. Once in the morning and once in the afternoon. Left a message for him to call me both times."

Baker then followed up with Reeves on the afternoon of March 3, 2017 at 3:22 p.m.:

> Pat, Just an update. I called again today and was sent to voice mail on the second ring. Bob has been with me each time I called and I have left voice messages each time, asking him to call me back. I can continue to call but am wondering if I should change my message to: Christian since you haven't returned my numerous calls I am assuming you have resigned your position. Thus far my message has been: Christian this is Floyd trying to get in touch with you, please call me back at 985-863-1533. What do you think? Continue to call or leave the new message?

Minutes later, Reeves responded: "Leave the new message and follow it up with a certified letter denoting termination."

AWG also submits that Johnson's employment record was another factor for his termination, contending that prior to March of 2017, Johnson was issued multiple written warnings and disciplinary notices concerning his subpar attendance and production.[17]   In response, Johnson puts forward evidence to suggest that AWG

_____

The following day, on March 4, 2017 at 11:24 a.m., Baker advised Reeves that he had received an email from Johnson asking whether there were any developments; Baker explained to Reeves:

> As I stated earlier, I left four messages and the last one I told Christian I was assuming he was resigning since he didn't return any calls.  I don't know that I should answer this email but what do you think?

Reeves responded: "Are you certain that you were dialing the correct phone number?  If so, then no."

Believing he had been calling the correct number, Baker replied:

> To the best of my knowledge it is the correct number.  I verified it with Christian when he came into my office. Additionally, I gave him my business card and wrote my cell on it so he could call me if he wanted.  I think he is just trying [to] get me in an email battle.  I will not email him back as you suggested.  Thanks and have a good weekend.

[17] For support, AWG points to employment records attached to Floyd Baker's sworn declaration, which indicate that Johnson received six disciplinary notices between October of 2016 and February of 2017: (1) he was interviewed on "10/11/18" for calling out on "10/8/16;" (2) he received a written warning on 11/6/16 for calling out 11/2/16; (3) he was placed on disciplinary probation for the period of "12/4/16 through 6/4/16" because of "attendance;" (4) he was also placed on disciplinary probation for the period of 12/19/16 through 6/16/17 because he left early on 12/19/16; (5) he received a final written warning on 1/23/17 because he left early on 1/22/17 and only worked 3 hours and 12 minutes that day; and (6) he received another final written warning on 2/19/17 because he had "missed production 178 cph."

fabricated disciplinary records bearing dates between October 11, 2016 and February 19, 2017 in an after-the-fact attempt to justify his termination. The plaintiff points to the following evidence to advance this theory: (1) an employee disciplinary notice stating that Johnson "called out on 10/8/16" is curiously dated two years later – "10/11/18;" (2) the name "Christian Johnson" is written in a strikingly similar manner on the top of several documents; and (3) he testified during his deposition that he had no recollection of these reports.

Johnson also points to evidence that he had a stellar production record prior to his final write-up, which was signed by Lloyd Faircloth on February 21, the day in which he engaged in protected activity. The record reflects that Johnson had received several raises and was often commended by his supervisors for the speed and skill with which he worked. It also reflects that Johnson was given a special "top dog" shirt by Lloyd Faircloth and was frequently asked to train other order selectors.

In its reply papers, AWG attempts to undermine Johnson's "fabrication" theory by contending that the record evidence supports that Johnson committed the infractions that led to each write-up. For instance, AWG submits that the absence reported on the misdated disciplinary notice is supported by a tardiness report, a notation on an attendance calendar, and Kronos time card records reflecting that no time was punched in or out on that date;

Johnson's other attendance issues are similarly documented in electronic Kronos time card records. But, AWG overlooks that, in advancing his fabrication theory, Johnson seeks to establish that AWG created a paper trail *after* he engaged in protected activity. This point-counterpoint, too, raises serious disputed fact questions as to whether Johnson's employment record was truly a factor in his termination.

Because the record is replete with fact issues that hinge upon the credibility of witnesses, summary judgment is patently inappropriate. Accordingly, for the foregoing reasons, IT IS ORDERED: that the defendant's motion for summary judgment is hereby GRANTED, in part, as unopposed, as to the plaintiff's race discrimination claims under Title VII and Louisiana state law, as well as to his § 1983 claims, and DENIED, in part, as to the plaintiff's retaliation claims.

New Orleans, Louisiana, April 11, 2019

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE